FILED

2017 Mar-15  PM 03:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| ROSA ANN BINION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.   7:14-cv-1140-TMP |
| | ) | |
| PNC BANK, NATIONAL | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This cause is before the court on the motion for summary judgment filed November 9, 2015, by the defendant, PNC Bank, National Association ("PNC"), which was incorrectly identified in the complaint as PNC Financial Services Group, Inc.[1]   Defendant seeks dismissal of all of plaintiff's claims arising from alleged discrimination at her workplace and from her subsequent termination.   This matter has been fully briefed,[2] and the court has considered the evidence and arguments set forth by both parties.   The parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

---

[1]    The Clerk is DIRECTED to change the style of the case to reflect the defendant's proper name.

[2]    The plaintiff has sought leave to file a surreply brief.   (Doc. 44).   The defendant has opposed the supplemental brief, arguing that the defendant's reply brief did not raise any new issues and the motion should be denied.   (Doc. 45).   While the court agrees that the brief is an attempt to "rehash, expand or restate" argument already made, the court GRANTS the motion, and has considered all of the plaintiff's arguments.

## I.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

2

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore

the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.   FACTS

Viewing the evidence provided by both parties in the light most favorable to the nonmoving plaintiff, the following facts are considered true for purposes of the defendant's motion for summary judgment.

Plaintiff Rosa Ann Binion is an African American female and was 58 years old when she filed her complaint.   Binion began working in banking in 1976 as a teller.   She was employed by AmSouth Bank and RBC Bank, both predecessors to PNC.   In June of 2012, after PNC acquired RBC, PNC employed Binion as a Financial Services Consultant ("FSC") in the Skyland Boulevard branch office in Tuscaloosa, Alabama ("Skyland").   Her duties included opening new customer savings and checking accounts, processing loan applications, and providing customer service.   In addition to a base salary, Binion could earn revenue credits for the sale of banking products such as loans, credit cards, or new accounts.   In order to receive the additional pay generated from revenue credits, an FSC was required to sell a threshold level of products, which was set at 150,000 revenue credits per quarter.

Beginning in July 2012, Joshua Winn, a then 28-year-old male Caucasian, was promoted to the position of branch manager at the Skyland branch.   Winn's promotion was the decision of David   Hedges,   PNC's   regional   manager.      Winn   was   transferred   to   Skyland   from   a

4

Birmingham-area PNC branch.   Binion reported to Winn from July 2012 until her termination on

July 25, 2013.   On July 23, 2012, Winn hired Elise Carr, a then 25-year-old Caucasian female, to

work as an FSC at Skyland.   The hiring of Carr was approved by Hedges.   Carr was interviewed

by both Hedges and Winn.   Binion and Carr were the only FSCs employed at Skyland at that time.

By late 2012 or early 2013, Binion believed that Winn and Carr were having a romantic

relationship.   In the spring of 2013, Binion complained to PNC Sales and Service Manager Jack

Wylie that Winn showed favoritism to Carr by funneling business to Carr and by taking long

lunches with her.   She based her belief that Winn and Carr were engaged in a romantic

relationship on the fact that it was "obvious" from Winn's and Carr's behavior around each other,

and that Carr was "getting all the credits and she is getting everything and she would take long

lunches."  (Binion Depo., Doc. 31-1, pp. 62-65).   She said that Carr would stay in Winn's office

"sitting on top of his desk." Id. at 64.     She also mentioned to Patrick Coryell, the branch

manager for the PNC branch located on University Boulevard in Tuscaloosa ("University"), that

Winn was showing favoritism to Carr.

After Binion complained to Wylie, Hedges visited the Skyland branch and spoke with each

employee, including Binion.   He did not specifically raise the issue of favoritism, but just talked

to every employee "in a non-threatening way," asking them if "everything [was] okay" at the

branch, and if anything "needed changing."   None of the employees, including Binion, expressed

to Hedges any issues with favoritism or unfair treatment.   Binion has testified that she was afraid

of Hedges and so did not complain to him.   Binion did not make any complaint to PNC's human

resources department or to any other manager or supervisor about Winn's treatment of her at that

time.

In early summer of 2013, Winn reported to Hedges that he was "having feelings" towards Carr.  As a result, on May 15, 2013, Carr transferred to the PNC branch at University, where she was managed by Coryell.   Carr and Winn began dating at some time shortly before or after[3]  Carr was moved to University.   Carr said one reason for her move to University was her relationship with Winn.

During the second quarter of 2013, Binion's sales performance was below the goal set for FSCs of 150,000 revenue credits, and she was ranked 15 out of the 19 FSCs in her region for revenue credits earned.   Binion testified that her numbers were low because Winn favored Carr and directed new loans and accounts to Carr instead of Binion.   After the rankings were released, Winn required Binion to submit an action plan regarding how she was going to improve in key areas, including loan production.

On June 20, 2013, a long-time customer of Binion's, referred to in the briefs as "HD,"[4] called PNC's main telephone number and was transferred to the University branch.[5]   He spoke with Carr about getting a rate quote for refinancing an existing home equity loan.   HD had been a

---

[3]     Binion's testimony suggests that Winn and Carr were romantically involved before Carr moved out of the branch that Winn managed, but Winn denies that the "dating" began until after Carr was moved.   Carr testified that they were only "good friends" in May of 2013.   Once the defendant raised the issue that favoritism to a paramour is not considered a violation of Title VII (see discussion, *infra*), Binion changed positions, arguing that her claim that she was discriminated against because of the alleged affair was "mistaken," and that her claim thus is "purely one of differential treatment on the basis of race and age."   (Doc. 38, p. 12).

[4]     The customer's full name is used in the complaint, but the briefing and most of the exhibits have been redacted to refer to him only as HD.

[5]     It is not entirely clear what number was called, but HD testified that he called the University branch because it was the first number for PNC that he found, and that Carr answered. (HD Depo., Doc. 31-8, p. 51).

customer of PNC and its predecessors for 25 years, and had worked with Binion for many years on his accounts.   He had spoken to Binion in 2012 about refinancing the home equity loan that he had with PNC.   He did not take any action until June of 2013, after he heard that interest rates were going to rise.   When he called PNC, he wanted to get a quote on an interest rate for the refinancing.   After Carr spoke with HD, she began a loan application for him, pulled his credit score, and told him what documents would be needed for the refinancing.[6]   Carr admits that she did not make all of the disclosures regarding a loan that are required by bank regulations before processing a loan.   Carr, on that date, began the process of submitting an application for HD's loan.   The process is referred to within the bank as "keying on" the application by inputting it into the bank's computer system.   A few days later, HD received a letter from PNC that quoted the interest rate available for his loan, and which set forth his credit score.   He did not give Carr permission to pull his credit score or apply for a loan, as he was only looking to get a "rate quote." (HD Depo., Doc. 31-8, pp. 52-53).[7]

On June 24, 2013, HD took the letter he received from PNC to the Skyland branch, where he spoke with Binion.   HD told Binion that he did not know that an application had been filled out for him, and said that he did not authorize Carr to pull his credit score.   HD told Binion that he wanted her to handle the loan and to get credit for it.   Binion learned that Carr had keyed on the

---

[6]     Carr testified that HD knew his credit was being pulled, and that she discussed the entire loan application process with him, but Binion asserts that HD was only asking a question about the rate and that HD did not want to deal with Carr because he wanted to do business with Binion.   For purposes of this motion, the court assumes as true the version favorable to the plaintiff.

[7]     It is undisputed that a rate quote available to any particular customer is dependent, in part, on that customer's credit score.   In order to get a rate quote, the credit score must be ascertained.

loan application on June 20, 2013, and that an application already was in the bank's system. Binion did not know what procedure to follow in order to process HD's loan refinancing.   To get direction on how to proceed, Binion called PNC's authoritative call center, known as "Back of House" or "BOH," which is designed for handling questions regarding loan closings.[8]   Binion wanted to have the loan application filed by Carr withdrawn, and for her new application to be used in its place.   Both Binion and HD wanted the first application withdrawn because it had been unauthorized in that HD had not given Carr permission to pull his credit score, and because HD wanted Binion to receive the revenue credits for processing the loan.

PNC has a Code of Business Conduct and Ethics ("Code of Ethics") that requires employees to "always act in a professional, honest and ethical manner" in their business dealings. Under the Code of Ethics, employees are expected to avoid conflicts of interest, make business decisions in the best interests of PNC, and never allow their judgment or actions to be compromised by personal interests.   Employees are obligated to report potential violations of PNC's Code of Ethics to PNC's employee relations department, the corporate ethics office, or their manager.

---

[8]     It is not entirely clear when HD's second loan application was keyed on, and when Binion called the BOH.   The exhibits offered to prove the times (exhibits 13, 14, and 15 to the plaintiff's deposition) are indecipherable, and even to the extent that some of the time indications can be read, there remains a dispute because the BOH call center in North Carolina is located in the Eastern Time Zone, but Binion was calling from Tuscaloosa, which is within the Central Time Zone.   The exhibits appear to refer to 24-hour military time without any reference to the time zone.   The transcripts of the conversations with the call center, and Binion's deposition, suggest that Binion called BOH once before 4:38 CST, once at 4:38 CST, and again at 5:53 CST.   The call center operator told Binion at 4:53 to "go ahead with the new app."   Binion then keyed on a second loan application for HD, apparently at 5:09 CST, although the defendant argues that Binion keyed on the application at 4:09 CST, before she made the calls.

Binion's manager, Winn, noticed when checking a report of new loans that the loan to HD had involved two applications.   Coryell, Carr's manager, also learned that two applications had been keyed on for the HD loan.[9]   Binion told Coryell that Carr had pulled HD's credit information without the customer's permission.   Coryell spoke with HD to determine if he was unhappy with the service he had gotten from Carr, but he did not specifically ask if HD had given permission for his credit report to be pulled.   HD did not voice any complaint to Coryell about his interactions with Carr, and Coryell concluded that Carr had been given permission to pull HD's credit.   HD told Coryell that Binion was going to resubmit the loan application since they had known each other for so long.   Coryell verbally counseled Carr regarding the need to be clearer with customers during the loan application process, and told her that she needed to read the proper disclosures to the customer.   He did not report Carr to PNC's Employee Relations Information Center ("ERIC").[10]   On June 26, 2013, Winn reported Binion to ERIC.

PNC assigned Kelly Parker, an ERIC investigator, to investigate whether Binion had manipulated the sales incentive program by submitting a duplicate application for HD in order to benefit herself.   Parker did not know whether pulling credit reports without authorization would invalidate the loan application filled out by Carr, and had not been trained in that area.   As part of her investigation, Parker interviewed Winn, Coryell, and Carr, and spoke with Binion three times

---

[9]   Plaintiff further asserts that Coryell told Binion that she should not have been terminated.   His testimony, however, was not that her conduct did not warrant termination, but simply that he did not like to fire people and wouldn't have wanted to fire her, but would have had to if he had been her supervisor.   (Coryell Depo., Doc. 32-4, pp. 30-31).   In any event, because Coryell was not Binion's manager, his opinion is irrelevant to the legality of the action taken.

[10]   Coryell testified that he would have reported Carr to ERIC if HD had complained to him that she proceeded without his consent.   (Coryell Depo., doc. 32-4, pp. 41-42).

regarding the loan application Binion filled out for HD.[11]   PNC had a policy that an employee's failure to be honest during an internal investigation is a violation of PNC's Code of Ethics and that an employee cannot continue to work at the bank if PNC has a reasonable belief that the employee engaged in a dishonest act.[12]

Parker made her first investigative call to Binion on July 16, 2013.  Before each call, Parker told Binion that it was important that she be "100 percent truthful."  (Parker Depo., doc. 32-1, p. 157).[13]   Binion stated, among other things, that: (1) HD had come to Skyland on June 26, 2013, with a letter from PNC, which Binion did not read or review, and (2) she submitted HD's application and subsequently saw that another application was already in the system, after which she called the BOH.   To determine what occurred on the day that HD's second loan application was keyed on, Parker also interviewed Paula Bobbit, who worked in BOH and who took what appeared to be the second[14] call from Binion to the BOH that day.   A transcript of Bobbit's conversation with Binion[15] included the following exchange:

---

[11]     Parker was located in North Carolina, and carried out her investigation by telephone and by consulting computer records.   There is no evidence that she met personally with any of the PNC employees in Tuscaloosa.

[12]     The rule that the employee cannot work after such suspicion springs from the PNC's Fidelity Bonding Policy.

[13]     Binion has stated that she does not recall being told that, but she does not actually dispute that Parker said it.

[14]     There is no transcript of an earlier call, but Binion did tell Bobbit: "It's just me, this [is] Rosa, again. ...."   Parker surmised that the earlier call may have been about a different matter and was not relevant to the HD loan.

[15]     Binion's comments are designated by "R" and Bobbit's comments by "P".

R:      This is what's happened, I don't have an app [loan application], but I got a question.   I have a client I guess they thought they was calling where I was and they called another branch and another branch keyed on the loan, which they should have, that's what I was telling [low voice can't decipher], but see all of the papers are with me.   And they keyed it on before I did.   Can I withdraw that loan and tell them what's happened or what should I do?

P:      You can call Branch Support and Branch Support should be able to help you with getting that credit or whatever.   Is that what you [are] trying to do?

R:      Oh yeah, I'm going to key it on again, but I don't want to confuse them and keep pulling the customer's credit again.

P:      Yeah, if you key it on again, they [are] going to pull the customer's credit and this is probably more than likely what's going to happen: If you rekey that application, it's going to be declined because you already have an application on the system and it's approved.   So what you need to do is call Branch Support, so you can get your credit for inputting the application, even though whoever.

                                        * * *

P:      Call Branch Support because they may have a way where they can tell you... you know[,] how it can be switched in the system or whatever, I don't know since they used their branch number, it's of course that branch that's gonna get credit for it.

R:      Right, and that's not what's ... that's not gonna to (sic) happen.

P:      Yeah, so you might want to call Branch Support. ...


(Doc. 32-3, pp. 3-4).   Binion told Bobbit repeatedly that Carr (although Carr was never identified by name) did not have authority to pull the credit, and that HD had only wanted an estimate on the interest rate when he talked with Carr.   Bobbit ultimately told Binion to call Branch Support and to email the loan specialist assigned to the first application "and let her know to have the application withdrawn."   (Doc. 32-3, pp. 5-6).

11

During Investigator Parker's second call to Binion, on July 23, 2013, Binion changed her account of the events, stating: (1) that she looked up HD in the system first, realized he already had a loan application, and then called BOH before submitting the second loan application and (2) that the letter HD brought in had his credit score on it.   This was inconsistent with her previous statement that she had not read or reviewed the letter.   After reviewing the transcripts of the calls Binion made to BOH regarding the HD loan, Parker concluded that Binion, and not Bobbitt, had initiated the plan to withdraw the first loan application.

Parker had a third interview by telephone with Binion on July 24, 2013.   In that conversation, Binion told Parker that she has re-thought everything and that version now may be completely different from earlier versions.   She said that she did "glance" at the letter HD brought into Skyland, and that she did not submit the loan application until after she called BOH.

Under PNC's Bonding Policy, an employee who is suspected of dishonesty during an investigation is to be placed on paid administrative leave pending the completion of the investigation.[16]   On July 24, 2013, based upon Parker's assessment that Binion had given inconsistent answers throughout the investigation, and because Parker believed that Binion had initiated the withdrawal of the first loan application for her own benefit under the sales incentive program, Binion was placed on paid administrative leave pending the completion of the

---

[16]     The plaintiff marked this assertion as disputed, but what plaintiff actually seems to dispute is whether PNC followed that policy.   Plaintiff argues that Carr also was involved in an ERIC investigation on a different matter, which will be discussed *infra*, and gave inconsistent answers, but was not placed on leave.   Accordingly, while there may be a dispute on whether the policy was uniformly or consistently applied, there is no dispute that the policy existed.

investigation.[17]    After being placed on leave, Binion called ERIC and complained that Winn was working to get her terminated, that Carr was always stealing her customers, and that Carr received preferential treatment because she was in a relationship with Winn.

Parker ultimately concluded that Binion's submission of a second loan application for HD amounted to a manipulation of PNC's sales incentive program, which Parker determined constituted a dishonest act under PNC's Code of Ethics.   Although Parker was not trained in the loan application process and did not know what effect the first loan application may have, Parker concluded that Binion had submitted the second application to benefit her own sales numbers and not to assist HD, whose credit score was pulled a second time.   Parker further concluded that Binion had been dishonest in interviews by providing inconsistent responses and stating that the BOH initiated the idea that Carr's application should be withdrawn when, in Parker's opinion from reviewing the transcript of the recorded conversation, Binion had initiated that idea.

At the conclusion of the investigation, Parker recommended to Winn and Hedges that Binion be terminated for violations of the PNC Code of Ethics.   Both Winn and Hedges supported the recommendation.   On July 25, 2013, Parker informed Binion that PNC was terminating her employment.

Following Binion's termination, in November 2013, PNC began an investigation of Winn for violating the Code of Ethics by sending the answers to an internal assessment to several employees.   On January 17, 2014, PNC terminated Winn's employment for engaging in a

---

[17]    Again, plaintiff states that this factual assertion is disputed.   What plaintiff actually disputes, however, is not that Parker made that assessment or that the leave was imposed, but that Parker's assessment was fair or accurate.

dishonest act.   PNC also terminated four of the employees who received the test answers and admitted using them.   Hedges agreed with the recommendation to terminate Winn and four other employees for dishonest acts. Carr was one of the employees who received the email with the test answers from Winn.   She was questioned, but was not terminated.   PNC determined that Carr had taken and passed the test before she received the answers from Winn.   Carr resigned, and was allowed to work until the date indicated in her letter of resignation.

On June 16, 2014, Binion filed the complaint that commenced this action.   She filed an amended complaint on February 18, 2015.   She asserts: (1) Title VII Race Discrimination (Disparate Treatment); (2) Title VII Race Discrimination (Hostile Work Environment); (3) Title VII Race Discrimination (Retaliation); (4) 42 U.S.C. § 1981 Race Discrimination; (5) 42 U.S.C. § 1981 Race Discrimination (Retaliation); (6) ADEA Age Discrimination; and (7) Title VII Gender Discrimination.

### III.   DISCUSSION

Plaintiff bases her complaint on Title VII, 42 U.S.C. § 2000e, *et seq*., which prohibits discrimination in the workplace on the basis of race, sex, or national origin; 42 U.S.C. § 1981, which prohibits discrimination in the right to contract based on race; and the Age Discrimination in Employment Act, which prohibits discrimination on the basis of age.[18]   In the instant case, plaintiff asserts that she was treated unfairly in that Winn funneled business to Carr instead of to

---

[18]      It is well settled that gender, race and age claims under these statutes are analyzed using the same framework as Title VII claims. See, *e.g.*, Gross v. FBL Financial Services, Inc., 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009); Turnes v. AmSouth Bank, NA, 36 F.3d 1057 (11th Cir. 1994).

her, and that Winn retaliated against her after she complained to Wylie that Winn was treating her unfairly and after she reported to ERIC that Carr had filed a loan application without HD's permission.    The defendant asserts that plaintiff's complaints of unfair treatment are not actionable.

### A.  Discrimination Claims

Claims under Title VII disparate treatment claims require proof of "purposeful discrimination" based upon one or more of the protected classes in the Act.    International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335, 97 S. Ct. 1843, 1854, 52 L. Ed. 2d 396 (1977); Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986, 108 S. Ct. 2777, 2784, 101 L. Ed. 2d 827 (1988) (In disparate treatment cases, "the plaintiff is required to prove that the defendant had a discriminatory intent or motive.").   At the core of a disparate treatment theory is the assertion that the employer chose deliberately to treat an employee (or group of employees) differently precisely *because* of the employee's race, sex, age, or other protected classification. An employer's motives unrelated to such suspect classifications cannot establish a disparate treatment claim.

The defendant asserts in this action that, because the Eleventh Circuit Court of Appeals has specifically concluded that Title VII "does not encompass a claim based on favoritism shown to a supervisor's paramour,"   Womack v. Runyon, 147 F.3d 1298, 1300 (11th Cir. 1998), Binion's claims are not viable.   In Womack, a postal carrier applied for a promotion to supervisor at a Georgia post office.   The local supervisor selected another candidate because he was engaged in a consensual sexual relationship with the other candidate.   147 F.3d at 1299.   Relying on a case from the Second Circuit Court of Appeals, and noting that most courts that have addressed the

question have reached the same conclusion, the court found that a supervisor's preferential treatment of a "paramour," while unfair, is not discrimination based on gender.[19]   The court went on to note that the Equal Employment Opportunity Commission has stated that "an isolated instance of favoritism towards a 'paramour' ... does not discriminate against women or men in violation of Title VII since both are disadvantaged for reasons other than their genders."   147 F.3d at 1300 (citing EEOC Policy Guidance on Employee Liability Under VII for Sexual Favoritism, EEOC Notice No. 915-048 (January 12, 1990)).   The district court in Womack granted a motion to dismiss the complaint for failure to state a claim, and the appellate court affirmed.

Courts within the Eleventh Circuit have followed the mandate that favoritism arising from a romantic relationship is "akin to nepotism" and is not actionable as age or race discrimination. Sherk v. Adesa Atlanta, LLC, 432 F. Supp. 2d 1358, 1371 (N.D. Ga. 2006) (quoting Elger v. Martin Memorial Health Systems, 6 F. Supp. 2d, 1351, 1353 (S.D. Fla. 1993)); DeHaan v. Urology Center of Columbus, LLC, 2013 WL 3227678 (M.D. Ga., June 25, 2013) ; Terhune v. Potter, 2009 WL 2382281 (M.D. Fla., July 31, 2009).   The district courts have followed not only precedent in this circuit, but the reasoning of other federal appellate courts.   As the Seventh Circuit Court of Appeals stated:

> Title VII does not ... prevent employers from favoring employees because of personal relationships.   Whether the employer grants perks to an employee because she is a protégé, an old friend, a close relative or a love interest, that special treatment is permissible as long as it is not based on an impermissible classification.

---

[19]     The court discussed DeCintio v. Westchester County Medical Ctr., 807 F.2d 304 (2nd Cir. 1986), and cases from the Fourth, Seventh, Eighth, Ninth, and Tenth Circuit Courts of Appeals.

Schobert v. Illinois Department of Transporation, 304 F.3d 725, 733 (7th Cir. 2002).   The conclusion consistently reached by courts is based on the logical determination that the discrimination or hostile environment that results from a workplace romance is experienced not only by members of a given age, race, or gender, but by *all* employees who are not engaged in the romantic relationship with the supervisor.   Sherk, 432 F. Supp. 2d at 1371 (citing multiple cases that explain that favoritism toward a paramour is gender neutral).[20]

In this case, Binion clearly stated, on several occasions, that the reason Carr was treated more favorably than Binion was because she was involved in a romantic relationship with Winn.[21] That Winn may have funneled loan business to Carr rather than to plaintiff, even Binion admits, was because Winn had romantic feelings toward Carr.   There is no substantial evidence that, as she argues now, he did so because he was discriminating against Binion due to her race or age. Likewise, Winn's decision to report Binion to ERIC for investigation was, at worst, motivated by his favoritism toward Carr, not racial or age-based animus against Binion.[22]   The same is true of

---

[20]   Similarly, a discrimination claim under Section 1981 must fail absent some demonstration that the conduct complained of is based on race and not a romantic relationship. See Willmore-Cochran v. Wal-Mart Assoc., Inc., 919 F. Supp. 2d 1222, 1234 (N.D. Ala. 2013).

[21]   When describing the racial aspect of her claims, she said: "That is what I said, Elise [Carr] and Josh [Winn], the two whites right there, he made sure she was taken care of.   If he was a true branch manager to both of us—he should have been a branch manager for the both of us. He shouldn't have showed the favoritism, race is what I saw because that is what I am, and he didn't ever offer anything or try to assist me with anything."   (Binion Depo., Doc. 31-1, p. 127).   In essence, Binion's only evidence that any of Winn's conduct had a racial or age bias is that Carr and Winn were white and were younger than Binion.

[22]   Of course it is also possible that Winn reported Binion to ERIC for investigation because he felt that was the proper thing to do under PNC's Code of Ethics.   Here, however, the court must view the evidence favorably to the non-moving party, and the most favorable version of the events to plaintiff supported by the evidence is that Winn reported her because he wanted to protect and assist Carr, with whom he had a romantic relationship.

his role in deciding to terminate Binion.   To the extent that Winn was involved in the termination decision,[23] the evidence supports only an inference that he was motivated by his desire to protect and assist Carr.   Whether Winn and Carr were actually "dating" at the time of the alleged favoritism is irrelevant, because even if the favoritism was based on friendship, it still is not actionable under Title VII.   Schobert, 304 F.3d at 733.   Even firing the female in a relationship while retaining the male is not gender discrimination if the employer's motive was favoritism or nepotism.   Platner v. Cash & Thomas Contractors, Inc., 908 F.2d 902, 905 (11th Cir. 1990) (finding no Title VII violation where the employer fired a female secretary who had been perceived to be in a relationship with a male crew supervisor because the male was the owner's son and the owner's motive was to "protect the family").   Because the substantial evidence in this case fails to show that the motive behind any actions taken against the plaintiff was violative of Title VII, § 1981, or the ADEA, plaintiff cannot establish her disparate treatment claims.

Moreover Binion does not allege that anyone at PNC ever made any disparaging remarks or engaged in any offensive conduct based on age, race, or gender.[24]   Her sole allegation of mistreatment or retaliation arises from her perception—evidently an accurate one—that Carr

---

[23]      The court will assume that Winn participated in the termination decision, even though the evidence shows that Parker made a recommendation reviewed and agreed to by Winn and Winn's supervisor, Hedges.

[24]      Alternatively, Binion has failed to present substantial evidence of "unwelcome harassment" that was sufficiently "severe or pervasive" as to alter the terms and conditions of her employment. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (elements of sexually hostile work environment); Dexter v. Amedisys Home Health, Inc. of Alabama, 965 F. Supp. 2d 1280, 1289 (N.D. Ala. 2013) (elements of age-related hostile work environment).   There simply is no evidence that she was subjected to a hostile work environment, much less one based on her race or age.

received preferential treatment because of her relationship with Winn.   Although Carr is both younger than Binion and white, none of the evidence suggests that Carr was treated differently because of any age-related animus or racial prejudice.[25]   To the contrary, Binion alleges, and the evidence supports, that Carr's preferential treatment was given to her because she was Winn's friend or lover. Without any evidence showing that Binion was subjected to a work environment that was "permeated with discriminatory intimidation, ridicule, and insult … sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," she simply cannot prove any hostile work environment claim.   Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002), quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L.Ed.2d 295 (1993).   Accordingly, the defendant is entitled to summary adjudication in its favor on the plaintiff's claims of discriminatory treatment on account of race, age, and gender.

## B.  Pretext

Even if Binion's claims were sufficient to state a *prima facie* case of age, race, or sex discrimination, the defendant still would be entitled to summary judgment in its favor.   Under the McDonnell-Douglas framework, once a *prima facie* case is shown, PNC must "articulate some legitimate, nondiscriminatory reason" for Binion's termination.   Texas Dep't of Community

---

[25]      In deposition, when directly asked if Winn showed favoritism to anyone other than Carr, Binion asserted that a "white, young, pretty" teller would leave her cash drawer out and was not punished.  (Binion Depo., Doc. 31-1, p. 118).   When asked whether Winn had engaged any racial harassment, Binion said that Winn "really just he wasn't harassing me per se per se [sic], but I know he told others that he was going to terminate me...."   Id. at p. 126.   Despite this testimony, her claims asserted in the Amended Complaint clearly allege that the discrimination was related to her treatment regarding the "duplicate app[lication]," and that the complaint she lodged was "about Winn's favoritism to Ms. Carr."   (Doc. 22, paragraphs 19, 20).

Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).    If PNC comes

forward with a nondiscriminatory reason for Binion's treatment, Binion must then show that the

proffered reason was merely a pretext, and that PNC's intent was discriminatory.   See Burdine,

450 U.S. at 254-56.    PNC's articulation of a legitimate, non-discriminatory reason for Binion's

termination shifts the burden to Binion to show that the reason either is not worthy of belief, or

that, in light of all the evidence, a discriminatory reason more likely motivated the decision than

the proffered reason.   Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998).

It is not enough for Binion to show that the articulated reason is false; she must further show that

the true reason for her termination was discriminatory.   See Clark v. Coats & Clark, Inc., 990 F.2d

1217, 1228 (11th Cir. 1993).   Further, it is not the duty of this court to evaluate whether the

decision to terminate Binion's employment was fair or wise; employers are free to make unfair or

unwise employment decisions so long as they do not violate anti-discrimination statutes.   See

Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

   PNC has demonstrated that Parker recommended Binion's termination because she

believed Binion had manipulated the sales incentive program and had been dishonest during the

investigation.   Parker based her recommendation on a fairly extensive investigation, which

showed that Binion gave conflicting accounts of the transaction during Parker's three telephone

interviews of her.   There is no indication that Parker did not honestly believe that Binion had

committed those acts,[26] nor is there any evidence that Hedges and Winn, who agreed with the

---

[26]    Plaintiff's counsel's argument that giving conflicting accounts is not tantamount to
dishonesty misses the point, which is that telling conflicting accounts *can* be an indicator of
dishonesty.   While it may also be simply a symptom of a faulty memory, that does not make
Parker's assessment that it indicated dishonesty any less objectively reasonable.

recommendation of termination, were actually terminating her for a separate discriminatory reason.

Finally, Binion, seeking to show a comparator, asserts that another employee engaged in similar misconduct and was not fired, but she does not allege that PNC had a policy or practice of ignoring infractions involving the manipulation of the sales incentives or dishonesty in the investigative process.   For comparisons to the treatment of another employee to be sufficient to establish disparate treatment actionable under the anti-discrimination statutes, "the quantity and quality of the comparator's misconduct be nearly identical" to that of the plaintiff.   Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).   While Binion accuses Carr of manipulating the process by filing an application on behalf of HD, the PNC investigation into that incident did not show the same level of manipulation—and the customer himself declined to accuse Carr of any wrongdoing.   The supervisor who decided to give Carr a verbal counseling was a different supervisor—Coryell—who has testified that he does not like to fire people.   Moreover, the investigator who conducted the investigation into Carr's conduct was a different investigator and did not recommend termination.   Also, there is no evidence that Carr was dishonest during the investigation of HD's loan application.   Later, when Carr was involved in Winn's misconduct regarding sending quiz answers employees, the ERIC investigation indicated that Carr was honest about having received the email, but that she did not cheat by using the information sent.   Carr is not similarly situated to Binion.[27]

---

[27]   Binion seems to assert that Winn is a comparator because he had been convicted of driving under the influence of alcohol on more than one occasion.   That conduct is not similar to Binion's conduct.   In addition, once Winn was investigated for the dishonest act of proving answers to a quiz, he was fired.

PNC's decision to terminate Binion after a single incident, given her record of good service for many years, may be an unwise business decision.   The relevant question, however, is whether the decision-makers who decided to terminate Binion's employment honestly believed Binion had engaged in manipulative conduct and had been dishonest during the investigation, and whether their beliefs were the reasons for the termination.   In this case, the plaintiff has not presented substantial evidence sufficient to allow a reasonable juror to determine a discriminatory reason more likely motivated the decision to terminate Binion than the reason provided by Parker. Questions of business wisdom may exist, as well as questions of fairness, but questions of discrimination are not sufficiently supported.   The evidence does not demonstrate that PNC's reason for Binion's termination is pretextual; accordingly, the motion for summary judgment is due to be granted for this additional reason.

### C.   Retaliation

Under prevailing Eleventh Circuit law, a Title VII retaliation claim exists in two instances: (1) when an employee is retaliated against because he or she has opposed an employer's practice that is unlawful under Title VII; and (2) when an employee is retaliated against for having participated in some form of investigation or proceeding involving Title VII.   Clover v. Total Systems Services, Inc., 176 F.3d 1346, 1350 (11th Cir. 1999).   The two types of protected activity are generally referred to as falling within either the "opposition clause" or the "participation clause."   Id.   The defendant asserts that it is entitled to summary adjudication of the retaliation claim because the plaintiff's complaints do not fit within either clause of the retaliation provision.   The plaintiff asserts that her complaints to Wylie and to ERIC constitute opposition to an unlawful practice.

The Eleventh Circuit Court of Appeals has made clear that, in evaluating opposition under the clause, "what counts is only the conduct that person opposed." Clover, 176 F.3d at 1352. In addition, protection under the opposition clause must be based on an "objectively reasonable" belief that the conduct the plaintiff "opposed" was violative of federal law. It is not enough that Binion subjectively believed that Winn's favoritism towards Carr was a form of discrimination violative of Title VII; her belief must be objectively reasonable. When the conduct opposed is simply not unlawful, the opposition to the conduct is not protected conduct. Little v. United Technologies, 103 F.3d 956, 959-60 (11th Cir. 1997).

In Little, an employee expressed his opposition to a co-worker's blantantly racist comment that the team of workers was run by "a bunch of niggers and I'm going to get rid of them." 103 F.3d at 958. The plaintiff expressed his opposition to the statement at a meeting that occurred eight months after the comment was made. The court noted that there was no Eleventh Circuit law addressing the issue of whether "opposition to a single comment by one co-worker to another can constitute opposition to an unlawful employment practice as a matter of law," but went on to explain:

> Having reviewed the record, we conclude that Little has failed to establish the first element of his prima facie case alleging retaliatory discrimination; that is, he has failed to show that he engaged in a statutorily protected activity. We note, at the outset, that only the Ninth Circuit has addressed the question at issue before us: Whether the expression of opposition to a single comment by one co-worker to another can constitute opposition to an unlawful employment practice as a matter of law. In *Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir.1978), the plaintiff objected to a racially derogatory remark uttered by a co-worker, demanded and received an apology from the same co-worker, and subsequently was fired. In finding that the plaintiff had failed to establish a prima facie case of retaliatory discharge under Title VII, the Ninth Circuit resolved that the opposition of an employee to a

co-worker's own individual act of discrimination "does not fall within the protection of [Title VII]." *Id.* at 142.

We agree with the Ninth Circuit's disposition of *Silver*, a case factually similar to the one at hand. As stated by that court,

> [b]y the terms of the statute ... not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.

*Id.* at 141.   We previously have held that in order to hold an employer responsible under Title VII for a hostile environment created by a supervisor or co-worker, a plaintiff must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 490 (11th Cir.1996).   *See also Silver*, 586 F.2d at 142 ("Even a continuing course of racial harassment by a co-employee cannot be imputed to the employer unless the latter both knows of it and fails to take remedial action.").   Here, Little's opposition to the racial remark uttered by Wilmot, a co-worker, is protected conduct within the parameters of the statute only if Wilmot's conduct can be attributed to Carrier.   Based on the facts of this case, we conclude that Wilmot's racially offensive comment alone is not attributable to Carrier and, accordingly, Little's opposition to the remark did not constitute opposition to an unlawful employment practice.

Little argues that even if Wilmot's comment, either in fact or in law, does not constitute an unlawful employment practice, he nonetheless can make out a prima facie case by showing that he reasonably believed that he was opposing a violation of Title VII by his employer.   We previously have recognized that a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. *See Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989).   It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component.   A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented.   It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir.1978). *See also Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981) ("To effectuate the policies of Title VII and to avoid the chilling effect that would otherwise arise, we are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of [Title VII] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices."), cert. denied, 455 U.S. 1000, 102 S. Ct. 1630, 71 L. Ed. 2d 866 (1982).

In light of the facts of this case, however, we find Little's assertion that he reasonably believed Wilmot's comment to be a violation of Title VII by Carrier to be implausible at best. As noted above, Little never voiced his concern over Wilmot to a supervisor or management-level employee at Carrier and reported the comment for the first time in a team meeting held approximately eight months after the remark was made. The record indicates that no rational jury could find Little's belief that his opposition to Wilmot's racist remark constituted opposition to an unlawful employment practice to be objectively reasonable. As a result, although we acknowledge that a plaintiff conceivably could prevail on his retaliation claim notwithstanding the fact that the practice he opposed was not unlawful under Title VII, such a circumstance is not presented in this case. We conclude not only that Little's opposition to Wilmot's racially derogatory comment did not constitute opposition to an unlawful employment practice as a matter of law, but also that, based on the particularized facts of this case, Little did not have an objectively reasonable belief that he was opposing an unlawful employment practice.

Little, 103 F.3d at 959 -960.   Accordingly, a complaint about conduct that cannot reasonably be believed to violate anti-discrimination laws is not a protected activity for Title VII and ADEA purposes.

Whether a complaint about a consensual sexual relationship can be protected activity was addressed in   Wheatfall v. Board of Regents of University Systems of Georgia, 9 F. Supp. 3d 1342, 1353   (N.D. Ga. 2014).   As that court explained:

To be sure, reporting sex discrimination or a sexually hostile work environment constitutes protected activity. *See* 42 U.S.C. § 2000e–5; *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). This is no less true because Wheatfall's complaints were informal. *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). But regardless of whether her complaints were formal or informal, they are not protected activity unless they satisfy two requirements.

First, her complaint must have put Georgia Tech on notice that she was opposing a practice made unlawful by Title VII. *See Murphy v. City of Aventura*, 383 Fed. Appx. 915, 918 (11th Cir. 2010) ("A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." (quoting EEOC Compl. Man. (CCH) §§ 8–II–B(2) (2006)) (internal quotation marks omitted)).

Second, the complaint must have been based on "a 'good faith reasonable belief' that her employer was engaged in unlawful discrimination." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir.1999). This means that Wheatfall must show that she "subjectively believed that [Georgia Tech] engaged in unlawful discrimination and that 'h[er] belief was objectively reasonable in light of the facts and record present.'" *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). And while the opposed conduct need not be unlawful discrimination, it "must be close enough to support an objectively reasonable belief that it is." *Clover*, 176 F.3d at 1351. To determine whether the opposed conduct is "close enough" to an unlawful employment practice, it is "measured against existing substantive law" at that time. *Id.*

While the record is far from clear that her complaints explicitly or implicitly notified Georgia Tech that she was opposing an unlawful employment practice, the Court nonetheless assumes without deciding that they did. The Court also assumes without deciding that Wheatfall subjectively believed that she was the victim of sex discrimination and that her work environment was sexually hostile. The question then is whether Wheatfall's beliefs were objectively reasonable. The magistrate judge concluded that they were not. Wheatfall objects to this conclusion. De novo review thus begins with a question: when is opposed conduct close enough to discrimination to constitute protected activity under the anti-retaliation provision?

This Court recently answered that question. See *Taylor v. Cardiovascular Specialists, P.C.*, 4 F. Supp. 3d 1374, No. 1:11–cv–4521–TCB, 2014 WL 1004118 (N.D. Ga. Mar. 17, 2014). As *Taylor* explains, the Eleventh Circuit's case law

26

> makes clear that the anti-retaliation provision does not protect plaintiffs who oppose conduct that cannot reasonably constitute discrimination—for example, when circuit precedent holds that such is not unlawful or where the conduct is not "anywhere near" sufficiently offensive. *Id.* at 1379, 2014 WL 1004118 at *4.

Wheatfall, 9 F. Supp. 3d at 1353-54.   Accordingly, a plaintiff cannot hold an objectively reasonable belief that her opposition is protected activity when the conduct opposed is conduct that circuit law indicates is not actionable as discrimination.

As already discussed above, circuit precedent makes clear that favoritism toward an employee because of a family or romantic relationship is not a basis for a claim of disparate treatment claim prohibited by the anti-discrimination statutes on the part of other employees.   See Womack v. Runyon, 147 F.3d 1298 (11th Cir. 1998).   Because circuit precedent so clearly has precluded such conduct from the assessment of actionable employment discrimination, Binion could not have possessed an objectively reasonable belief that Winn's favoritism toward Carr violated any federal anti-discrimination statutes.   Based upon clear Eleventh Circuit law, Binion's claims fall into the category of claims that "cannot reasonably constitute discrimination ... because circuit precedent holds that such is not unlawful [conduct]."   Wheatfall, 9 F. Supp. 3d at 1354; see also Little, 103 F.3d at 959-60.   In Little, the court held that the plaintiff's opposition to the racist remark of a coworker did not constitute opposition to an unlawful employment practice because the comment was not attributable to the employer—a legal requirement that an average worker unschooled in the law likely would not fully understand or expect.   Similarly, the court has little doubt that Binion honestly believed that Winn's romantic relationship with an employee that he

supervised violated federal law.[28]   In this case, <u>Binion</u> first made mention of Winn's conduct to Wylie—but not to any HR representative—in early 2013.   Her complaint was that "something was going on" with Winn and Carr.   The only other complaint she lodged was with ERIC after she was investigated and placed on leave for filing a duplicate loan application.   Her complaint to ERIC was not about age, race, or sex discrimination, but was that "Winn was working to get her terminated, that Carr was always stealing her customers, and that Carr received preferential treatment because she was in a relationship with Winn."   Thus, Binion's own complaints to Wylie and ERIC—the factual events she claims to be protected opposition to discrimination—did not ever assert that Winn's conduct was discrimination based on Binion's gender, race, or age.   As in <u>Little</u>, neither circuit precedent nor the facts of the case indicate that the plaintiff engaged in a protected activity by complaining about Winn's favorable treatment of Carr.

As in <u>Wheatfall</u>, Binion subjectively believed that Winn's conduct violated federal law. In this case, however, the evidence does not show that Binion's complaint's about favoritism put PNC on notice that she was alleging any violations of Title VII, Section 1981, or the ADEA. Moreover, Binion's belief that the favoritism violated federal law cannot be deemed to have been objectively reasonable in light of the clear pronouncements of the Eleventh Circuit Court of Appeals.   Binion did not lodge a complaint that she was being discriminated against on the basis of age, race, or sex; she alleged that she was being treated unfairly because of Winn's romantic favoritism towards Carr.   Where there is no opposition to discrimination that violates federal law,

---

[28]   The concept that a supervisor can treat one employee unfairly because he or she is engaged in a sexual relationship with another employee, and that the conduct is not discrimination on account of sex, does seem to be a perplexing conclusion.   The court recognizes, however reluctantly, that the appellate courts have decided that it is not violative of Title VII.

there can be no viable retaliation claim.   A court within this district has rejected a similar retaliation claim, noting that a "complaint concerning paramour favoritism in the context of third-party inter-office relationship are insufficient to state claims for gender discrimination and/or sexual harassment under Title VII."   Watkins v. Fairfield Nursing and Rehabilitation Center, LLC, 2012 WL 1566228 * 5 (N.D. Ala. 2012) (describing the "mound of caselaw" that rejects paramour favoritism as a claim under Title VII and therefore as a basis for a retaliation claim).

The evidence in this case, and the clear law of the Eleventh Circuit Court of Appeals, compels the conclusion that the plaintiff did not engage in a protected activity when she complained to Wylie and ERIC about Winn's romantic favoritism toward Carr, and that she therefore cannot sustain a claim of retaliation.   For this reason, the defendant's motion for summary adjudication of the retaliation claim is due to be granted.

In addition, the defendant's establishment of a legitimate, nondiscriminatory reason for the alleged retaliatory action also serves to rebut a *prima facie* case of retaliation under Title VII. Wheatfall, 9 F. Supp. 3d at 53.   As discussed *supra*, the defendant has demonstrated that Binion was fired because an investigation led the decisionmakers to believe that she had been dishonest in the investigation and had manipulated a loan application in order to benefit her own sales numbers. Binion has not demonstrated that the articulated, nondiscrimnatory reason is a pretext and that the real reason for her termination was retaliation for the complaints she made to Wylie and ERIC. For this additional reason, the motion for summary judgment is due to be granted as to plaintiff's retaliation claims.

## IV.   CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented and the law governing this action, this court determines that PNC's motion for summary judgment (doc. 29) against Binion's claims is due to be GRANTED, and her claims of discrimination on the basis of sex, age, and/or race under Title VII, 42, U.S.C. § 1981, and the ADEA are due to be DISMISSED WITH PREJUDICE.   Similarly, her claims that she suffered retaliation are unsupported by substantial evidence and are due to be DISMISSED WITH PREJUDICE.

A separate order will be entered in accordance with the findings set forth herein.

Dated the 15th day of March, 2017.


_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE